UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

MATHSON INDUSTRIES, INC.,

        Debtor,

_____/

WENDY TURNER LEWIS, Trustee of the
Chapter 7 Bankruptcy Estate of Mathson
Industries, Inc.,

        Plaintiff/Appellee,

v.

NEGRI BOSSI USA, INC.,

        Defendant/Appellant,

_____/

Case Nos. 09-13148
09-13149

Honorable Patrick J. Duggan

Chapter 7 Case No. 09-42894

Adversary No. 09-04639-tjt

Honorable Thomas J. Tucker

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on January 26, 2010.

PRESENT:      THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

Wendy Turner Lewis ("Plaintiff"), Trustee of the Chapter 7 bankruptcy estate of

Mathson Industries, Inc. ("Mathson"), filed an adversary proceeding against Negri Bossi

USA, Inc. ("Defendant"), in the United States Bankruptcy Court for the Eastern District

of Michigan on April 17, 2009.   In that action, both parties filed motions for summary

judgment.  On July 30, 2009, United States Bankruptcy Judge Thomas J. Tucker issued a

bench opinion granting, in part, Plaintiff's motion and denying Defendant's motion.

Judge Tucker also entered an injunction against Defendant.  On August 11, 2009, Defendant filed an appeal as of right from the injunction and a motion for leave to appeal the decisions on the motions for summary judgment.  On September 30, 2009, this Court granted the motion for leave to appeal and ordered that the appeals be consolidated.  The issues on appeal have now been fully briefed and the Court held oral argument on January 14, 2010.

## I. Facts and Procedural Background

As part of the underlying bankruptcy case, Mathson's estate included a number injection molding machines sold to Mathson by Defendant.  Mathson never paid for those machines but Defendant failed to perfect its security interest in eight machines being maintained outside of the state of Michigan.  Originally valued at over $3,000,000, the eight machines were the most valuable part of Mathson's estate and Plaintiff desired to sell them at auction pursuant to 11 U.S.C. § 363.

In the underlying adversary action, Plaintiff alleges that Defendant attempted to control bidding on the machines by telling potential purchasers that it would not provide necessary services and parts—referred to in this case as "servicing capabilities"—for machines purchased from Plaintiff.  By its actions, Defendant intended to suppress bidding on the machines so that it could purchase the machines at a low price from the estate and then resell them to the potential purchasers at or near full-price.  (*See* Bankr. Ct. Bench Op. at 21-40 (summarizing record evidence).)  In this way, Defendant would basically be able to recover all of its unsecured claim against Mathson.

As a result of Defendant's actions, one previously identified potential purchaser of

the two largest and most expensive machines, Draexlmaier Automotive Group of America, LLC ("Draexlmaier"), informed Plaintiff that it would not be able to submit a bid for the machines.  (Pl.'s Mot. for Summ. J. Ex. 12.)  This left Plaintiff with only Defendant's bid for the eight machines in the amount of $100,000 plus waiver of its unsecured claim in the bankruptcy.  Based on these events, Plaintiff sought relief in a two-count complaint alleging (1) violation of 11 U.S.C. § 363(n), and (2) violation of 11 U.S.C. § 362(a)(3) and (a)(6).  In both counts, Plaintiff requested that the bankruptcy court exercise its power as set forth in 11 U.S.C. § 105(a) and grant injunctive relief as a remedy to the alleged violations.  Plaintiff specifically requested that the bankruptcy court order Defendant to provide servicing capabilities to purchasers of the machines at a cost equivalent to what Defendant charges other customers in its ordinary course of business.  At some point during these events, Draexlmaier submitted a bid for the two larger machines of $1,512,000 contingent upon assurances that Defendant would provide servicing capabilities either voluntarily or upon court order.  (*See* Bankr. Ct. Bench Op. at 54-55.)

In a July 30, 2009, bench opinion, the bankruptcy court agreed that Defendant's conduct violated 11 U.S.C. § 362(a)(6) and granted Plaintiff summary judgment as to that claim only.  Because Plaintiff sought the same relief in each of her claims, the bankruptcy court did not address the alleged violations of 11 U.S.C. §§ 362(a)(3) and 363(n).  (*Id.* at 41, 61.)  Furthermore, to the extent the bankruptcy court granted summary judgment to Plaintiff, the bankruptcy court also denied Defendant's motion for summary judgment.  (*Id.* at 61.)  To remedy the violation of 11 U.S.C. § 362(a)(6), the bankruptcy court

3

entered the following injunctive order:

> From the entry of this Order through September 1, 2012, Negri Bossi, and all agents and other persons acting in concert with Negri Bossi, are permanently enjoined from:
>
> (a) communicating to potential purchasers of the Machines that Negri Bossi will not provide Servicing Capabilities to them if they purchase one or more of the Machines from Trustee; and
>
> (b) refusing to provide Servicing Capabilities to the purchaser(s) of one or more of the Machines at the same cost that it charges its other customers in the ordinary course of its business for such Servicing Capabilities. In its discretion, Negri Bossi may require payment in advance in cash equivalent prior to providing any such Servicing Capabilities.

(Bankr. Ct. Perm. Inj. Order ¶ 2.)  The bankruptcy court left for another day the issue of whether Defendant could be held liable for monetary damages relating to its violation. (*Id.*)  After the issuance of the injunctive order, Draexlmaier completed its purchase of the two larger machines for $1,512,000 and Plaintiff sold the remaining six machines at public auction to Defendant for $499,730.

The primary issues on appeal include whether Defendant violated the automatic stay in a manner prohibited by 11 U.S.C. § 362(a)(6) and, if so, whether the injunction entered by the bankruptcy court is an appropriate remedy for such a violation.  In the event Defendant succeeds in obtaining reversal of the bankruptcy court on those issues, Defendant also seeks an order from this Court denying Plaintiff's motion for summary judgment in its entirety, granting Defendant's motion for summary judgment as to all claims, and dismissing the case.

## II. Standard of Review

The bankruptcy court's findings of fact are reviewed under the clearly erroneous standard.  *Booher Enter. v. Eastown Auto Co. (In re Eastown Auto Co.)*, 215 B.R. 960,

4

963 (B.A.P. 6th Cir. 1998). The bankruptcy court's conclusions of law are reviewed *de novo*. *Id.* at 964. This means that the reviewing court must decide legal issues as if the issues had not been decided before. *Id.* Because "[t]he grant of summary judgment presents a pure question of law," the Court reviews the bankruptcy court's ruling in this case *de novo*. *Superior Bank, FSB v. Lewis (In re Lewis)*, 398 F.3d 735, 746 (6th Cir. 2005).

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*, 477 U.S. at 251-52, 106 S. Ct. at 2512.

## III. The Automatic Stay and 11 U.S.C. § 362(a)(6)

The foundation of Plaintiff's success in the bankruptcy court is Defendant's alleged violation of 11 U.S.C. § 362(a)(6). Specifically, the bankruptcy court concluded that Defendant's refusal to provide servicing capabilities to the trustee or potential purchasers

and attempt to obtain the machines for far less than their actual value amounted to an "act to collect, assess, or recover a claim against the debtor that arose before the commencement" of Mathson's bankruptcy case in violation of the automatic stay. 11 U.S.C. § 362(a)(6). Defendant argues that the bankruptcy court erred, as a matter of law, in concluding that such conduct violates the automatic stay.

Before jumping to the specifics of § 362(a)(6), the Court pauses to consider the importance and purpose of the automatic stay to bankruptcy proceedings. The oft quoted legislative history of § 362 explains the intended scope and purpose of the automatic stay:

> It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.
> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of their claims in preference and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure in which all creditors are treated equally.

H.R. Rep. No. 95-595, at 340 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 6296-97; S. Rep. No. 95-989, at 49, 54-55 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5835, 5840-41. Although cases involving stay violations typically evoke concerns for the debtor, the unique circumstances of this case implicate the second purpose of the automatic stay. Defendant's refusal to provide services for and attempt to obtain possession of the machines is of no particular concern to Mathson, a company that is being liquidated; by its conduct, however, Defendant intends to increase significantly its own recovery at the expense of other creditors. Keeping in mind the stay's intended

protection of creditors, the Court now turns to the particulars of Plaintiff's claim against Defendant.

In analyzing a claimed violation of § 362(a)(6), the Sixth Circuit has provided the following as a "useful guide:" "a course of conduct violates § 362(a)(6) if it '(1) could reasonably be expected to have a significant impact on the debtor's determination as to whether to repay, and (2) is contrary to what a reasonable person would consider to be fair under the circumstances.'" *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 423 (6th Cir. 2000) (quoting *In re Briggs*, 143 B.R. 438, 453 (Bankr. E.D. Mich. 1992)). This test arose in the context of cases where creditors sought to recover pre-petition debts from bankruptcy debtors. *See Pertuso*, 233 F.3d 417; *In re Briggs*, 143 B.R. 438. As a result, the first element of this "useful guide" limits its analysis to conduct directed against the bankruptcy debtor. Such conduct is absent in this case.

Nonetheless, the bankruptcy court concluded, and this Court agrees, that the statutory language of § 362(a)(6) actually prohibits "any act to collect, assess, or recover" a pre-petition debt, not just acts directed *against the bankruptcy debtor*. (*See* Bankr. Ct. Bench Opinion at 12-18 (quoting 11 U.S.C. § 362(a)(6)).) In considering this claim, then, the Court considers conduct violative of § 362(a)(6) if it (1) could reasonably be expected to have a significant impact on the creditor's ability to collect, assess, or recover a pre-petition debt, and (2) is contrary to what a reasonable person would consider fair under the circumstances. Defendant's conduct in this case satisfies both elements of this test.

**1. Significant Impact**

7

Contrary to Defendant's self-serving arguments that its conduct would not have a significant impact on its recovery, the record is replete with evidence that Defendant's conduct could reasonably be expected to have a significant impact on Defendant's ability to recover its pre-petition claim. Defendant's own statements and admissions before and during this adversary action reveal that the refusal to provide servicing capabilities could reasonably be expected to diminish the value of the machines such that Plaintiff would have no other option than to sell them to Defendant for a mere pittance at the expense of other creditors. In a March 9, 2009, letter to Plaintiff's counsel, Defendant's counsel explained that potential purchasers having to disassemble, transport, reassemble, and re-calibrate the machines would face "a very high probability that the Machines will be damaged" and that, once damaged, Defendant would refuse to assist with repairs. (Pl.'s Mot. for Summ. J. Ex. 2.) The letter went on to warn that "[a]t some point prospective purchasers will understand that they will *need* [Defendant's] assistance now or in the future and it will not be forthcoming," and that, "because of the lack of service and support, the purchaser may be buying nothing but expensive scrap." (*Id.* (emphasis added).)

These warnings were not mere hyperbole. A memorandum between two of Defendant's employees reveals that a purchasing agent for Draexlmaier understood the value of Defendant's service and support. (Pl.'s Mot. for Summ. J. Ex. 9.) The purchasing agent indicated that, without Defendant's servicing capabilities, she would recommend that Draexlmaier refrain from purchasing the machines. (*Id.*) Indeed, Draexlmaier later informed Plaintiff's counsel that it would decline to make a bid for the

machines absent a guarantee that Defendant would provide servicing capabilities.  (Pl.'s Mot. for Summ. J. Ex. 12.)

That Defendant's conduct would have a significant impact on the ultimate disposition of the machines should come as no surprise to Defendant; Defendant specifically engaged in the conduct at issue with the intention of re-acquiring the machines from Plaintiff.  In the same memorandum discussed above, Defendant's employee noted that Defendant felt that refusing servicing capabilities was Defendant's "only recourse to encourage [Plaintiff] to negotiate seriously with [Defendant]."  (Pl.'s Mot. for Summ. J. Ex. 9.)  In deposition testimony, Defendant's general manager admitted that Defendant's conduct was motivated by Mathson's nonpayment for the machines, conceded that there was a substantial likelihood that the machines would be inoperable without Defendant's assistance, and confirmed Defendant's intentions ultimately to obtain payment for the machines by refusing services.  (*See* Bankr. Ct. Bench Op. at 30-40 (summarizing deposition testimony of Liam Burns).)  Under these circumstances, there is no genuine issue of material fact that Defendant's conduct could reasonably be expected to have a significant impact on the Defendant's ability to collect, assess, or recover its pre-petition debt.

## 2. Fairness

Assuming the first element of the test is met, Defendant next argues that its conduct is not contrary to what a reasonable person would consider fair under the circumstances. In making this claim, Defendant asserts that, under normal circumstances, it could refuse to provide servicing capabilities to any potential customer and that its expressed intent to

recover on a pre-petition claim does not convert this otherwise lawful conduct into unlawful conduct.  The Court disagrees.

It is largely irrelevant whether Defendant's conduct would be considered fair outside of the bankruptcy proceedings; the § 362(a)(6) analysis requires consideration of Defendant's conduct "under the circumstances"—circumstances which include the bankruptcy stay and the stay's intended protection of creditors.  Under the circumstances of this case, Defendant's conduct deprives the bankruptcy estate of the most valuable part of the debtor's property at the expense of all other creditors.  In essence, Defendant's refusal of servicing capabilities allows Defendant to revive its unperfected security interests.  Defendant, however, is the only entity to blame for the unperfected security interests and it would be unfair to allow Defendant to rectify its own error at the expense of other creditors.  Intervention of the Court is therefore necessary to ensure an orderly liquidation procedure in which all creditors are treated equally.

In making its argument to the contrary, Defendant primarily relies on *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81 (3d Cir. 1988).  Defendant asserts that this case stands for the proposition that conduct lawful outside of bankruptcy proceedings is not made unlawful by the debtor's bankruptcy filing.[1]  In *Brown*, a credit union sent a letter to a debtor stating that it would bar the debtor from membership unless she reaffirmed, with court approval, her outstanding debt.  *Id.* at 82.  In concluding that

---

[1]Defendant cites numerous other cases for the proposition that mere requests for payment from a bankruptcy debtor do not violate § 362(a)(6).  (*See* Def.'s Appeal Brief at 15-16.) Defendant went beyond making a "mere request for payment," however, when it refused to provide servicing capabilities to potential purchasers of the machines.

such conduct does not violate the automatic stay, the Third Circuit observed that the denial of the credit union's services, which were available at other institutions, was not necessarily coercive and that the credit union's conduct was designed to protect the credit union from repeated defaults.  *Id.* at 85-86.  Under those circumstances, the Third Circuit found nothing in the bankruptcy code to require the credit union to continue doing business with the debtor and held that a ruling to the contrary "would impermissibly extend the scope of the code's anti-discrimination provisions."  *Id.* at 85 (referring to 11 U.S.C. §525's prohibition of discrimination against debtors by the government and employers).

The present case is distinguishable from *Brown* in several material respects.  First, Defendant's refusal of servicing capabilities is not analogous to the denial of services by a credit union.  Defendant's conduct is not motivated by a desire or need to protect itself from future default or loss.  In fact, Defendant only furthers its losses by refusing to provide servicing capabilities; Defendant typically generates a profit by providing servicing capabilities to machine owners and that profit potential is protected by the terms of the injunction.  (*See* Dep. of Liam Burns, Pl.'s Mot. for Summ. J. Ex. 1 at 148-50.) Furthermore, Defendant can protect itself from losses similar to those sustained in the underlying bankruptcy case by properly perfecting its security interests in machines sold to future customers.  Defendant's refusal in this case is also distinguishable from the refusal in *Brown* by the fact that the servicing capabilities here are not readily available

11

from other providers.[2]  Because purchasers of the machines could not reasonably go to another service provider for assistance, Defendant's refusal to provide servicing capabilities took on a coercive character that the credit union's refusal lacked in *Brown*.[3]

Second, the Third Circuit's concern regarding impermissible extensions of the bankruptcy code's anti-discrimination provision is not implicated by the present case. While the bankruptcy code does not explicitly require Defendant to provide servicing capabilities to purchasers of the machines, it does prohibit Defendant from engaging in "any act to collect, assess, or recover" a pre-petition debt.  11 U.S.C. § 362(a)(6).  Having concluded that Defendant's conduct violates that statutory language, the Court need not extend the code's anti-discrimination provision to justify intervention.  Furthermore, the anti-discrimination provision has no relevance to this case considering that Defendant's

---

[2]On appeal, Defendant argues that the servicing capabilities are, in fact, available from other providers.  (*See* Def.'s Brief on Appeal at 6, 24-25.)  In support, Defendant cites a web posting of a competitor that states the competitor "can take any manufacturer's machine and make it good as new, including everything you need to get it up and running fast." (*See id.* at 25.)  The Court, however, considers this unauthenticated posting insufficient to create a genuine issue of material fact as to the reasonable availability of servicing capabilities especially in the face of admissions by Defendant and its agents that purchasers will *need* Defendant's assistance; that there is a "substantial likelihood" that the machines will be inoperable without Defendant's support; that Defendant's servicing capabilities would be the quickest, most cost-effective solution for problems with the machines; and that Defendant remains unaware of any other company in the United States that has successfully provided start-up services for the two larger machines.  (*See* Pl.'s Mot. for Summ. J. Ex. 2; Dep. of Liam Burns, Pl.'s Mot. for Summ. J. Ex. 1 at 124-34.)

[3]Defendant spends some time in its brief arguing that its conduct was neither harassing nor coercive because its statements were made in the course of "settlement negotiations" and were not repetitively made.  (*See* Def.'s Brief on Appeal at 17.)  The Court agrees that Defendant's conduct was not "harassing."  Statements need not be unsolicited or repetitive, however, to qualify as "coercive."  *See In re Levine*, 132 B.R. 475, 477 (Bankr. M.D. Fla. 1991) (finding a single letter to be coercive under the circumstances of the case).  It is the circumstances under which Defendant made its refusal of servicing capabilities that renders that conduct coercive, not any singular statement of refusal in the abstract.

conduct is directed against the bankruptcy estate and third parties rather than the bankruptcy debtor.

Finally, Defendant's reliance on *Brown* ignores the fact that bankruptcy courts regularly issue orders regarding creditor conduct that could not otherwise issue except that they are necessary to effectuate the bankruptcy code.  In *Sechuan City, Inc. v. North American Motor Inns, Inc. (In re Sechuan City, Inc.)*, 96 B.R. 37 (Bankr. E.D. Pa. 1989), for example, the bankruptcy court considered a creditor's attempts to discourage potential customers from patronizing a debtor-restaurant by posting signs regarding the debtor-restaurant's financial condition.  After considering the guidance of the *Brown* decision, the bankruptcy court concluded that the creditor violated § 362(a) when it "undertook a studied effort to coerce payment of the lessor's prepetition claim."  *Id.* at 41.  What is more, the bankruptcy court rejected the creditor's attempt to shield the wrongful conduct by invoking the First Amendment's freedom of speech.  *Id.* at 44.  So, while the creditor would have been able to engage in such conduct outside of a bankruptcy proceeding, the protections of the bankruptcy code justified the bankruptcy court's intervention.

Furthermore, a bankruptcy court's ability to intervene is not limited to requiring that creditors refrain from certain conduct; in *Sportfame of Ohio, Inc. v. Wilson Sporting Goods Co. (In re Sportfame of Ohio, Inc.)*, 40 B.R. 47 (Bankr. N.D. Ohio 1984), a bankruptcy court ordered that a sporting goods manufacturer engage in business that it otherwise would have declined.  Like Defendant in this case, the sporting goods manufacturer in *Sportfame* attempted to force the Chaptor 11 bankruptcy debtor to pay its pre-petition debts by refusing to fulfill future orders of otherwise irreplaceable goods.  *Id.*

13

at 48-49.  The bankruptcy court concluded that such conduct violated § 362(a)(6) and ordered that the sporting goods manufacturer continue supplying goods to the debtor in exchange for up-front cash payments.  *Id.* at 51, 53.  The fact that this case arose in the context of a Chapter 11 case, rather than Chapter 7, does nothing to diminish the general proposition that a bankruptcy court may intervene when necessary to enforce provisions of the bankruptcy code.

In a related argument, Defendant objects that the analysis set forth above impermissibly deems otherwise lawful conduct unlawful merely because of Defendant's *expressed* intention to recover the value of the pre-petition claim.  In other words, Defendant believes that the Court would allow it to deny servicing capabilities to purchasers had Defendant simply refused to express its reasons for doing so.  Defendant's argument echoes a statement by the Third Circuit in *Brown*.  As previously explained, *Brown* addressed the refusal of a credit union to provide future services to a bankruptcy debtor who declined to reaffirm her pre-petition debt.  Therein the Third Circuit wrote:

> Having concluded that [the credit union's] bylaw provision [denying
> services] is valid, we do not see how merely sending the letter
> [informing the debtor of the bylaw] offends the bankruptcy laws.  To
> hold otherwise allows the credit union to deny services to a debtor but
> forbids it to say why.  The result is unreasonable, and finds no support
> in the statute or its history.

*Brown*, 851 F.2d at 86.  Defendant's reliance on this passage is fundamentally flawed, however, because neither this Court nor the bankruptcy court has concluded that Defendant's conduct in this case was valid in the first instance.

Contrary to Defendant's interpretation of the ruling, this Court considers

Defendant's conduct violative of the stay because the conduct allows Defendant to recover its pre-petition debt at the expense of other creditors, not because Defendant expressed an intention to obtain such a result.  Had Defendant expressed an intention to recover a pre-petition claim without engaging in any conduct to effectuate that intent, there would be no violation of the stay.  Conversely, by engaging in an act to recover a pre-petition claim, Defendant violated the stay regardless of its expressed intentions.  Admittedly, a defendant's express intentions will normally be relevant to determining whether an act is taken "to collect, assess, or recover" a pre-petition debt.  *See Cousins v. CitiFinancial Mortgage Co. (In re Cousins)*, 404 B.R. 281, 287 (Bankr. S.D. Ohio 2009).  Ultimately, though, the Court agrees with the Third Circuit's observation that it is not the mere expression of intent that makes a creditor's conduct unlawful; the proper analysis focuses on whether the conduct in question actually violates a provision of the bankruptcy code.[4]

In this case, Defendant did more than simply express an intent to collect a pre-petition debt; Defendant engaged in conduct in furtherance of that intent.  Specifically, Defendant (1) informed a prospective purchaser that it would not provide support or maintenance for machines purchased from the bankruptcy estate, (Pl.'s Mot. for Summ. J.

---

[4]To the extent that *Sportfame* relies on the creditor's expression of intent to justify its ruling, this Court disagrees with that opinion.  *See Sportfame*, 40 B.R. at 50 ("Wilson could have simply refused, for any reason, to sell goods to debtor or offered no explanation for its refusal to do business.  Instead, its sole reason for refusing to sell goods to debtor was its desire to collect its prepetition debt.") Rather, the Court considers dispositive the fact that the creditor's conduct in *Sportfame* "had the effect of interfering with the reorganization effort, a result at odds with the purpose of the bankruptcy laws."  *Id.*

Exs. 9, 11),[5] and (2) offered to purchase the machines from Plaintiff for far less than their

value, knowing other purchasers would require the assistance Defendant refused to

provide, (Pl.'s Mot. for Summ. J. Ex. 14).[6]  In this way, Defendant sought to pursue its

own remedy against the debtor's property to the detriment of other creditors.  The

conduct more specifically violates § 362(a)(6) in that it (1) could reasonably be expected

to have a significant impact on the creditor's ability to collect, assess, or recover a pre-

petition debt, and (2) is contrary to what a reasonable person would consider fair under

the circumstances.  Having identified a violation of the bankruptcy code, the Court now

turns to consider the appropriateness of injunctive relief.

## IV. Injunctive Relief

After concluding that Defendant's conduct violated § 362(a)(6), the bankruptcy

court determined that the only viable remedy for the violation was to issue an injunction

---

[5]As previously discussed, exhibit 9 is a memorandum between two of Defendant's employees indicating that Draexlmaier had been informed about Defendant's refusal to provide services.  Exhibit 11 is a letter from Defendant to Draexlmaier confirming the same.

[6]Exhibit 14 reflects Defendant's offer for the machines.  Therein, Defendant explains that its offer is made in the context of the facts that "Negri Bossi will not service, support or provide replacement parts for any of the Machines[;] Negri Bossi will advise prospective purchasers of this fact if asked by them[;]" and "[t]he two large Machines require special handling for removal and set up.  Negri Bossi will not provide this assistance to purchasers.  There is a substantial likelihood that these Machines will not be operable without this assistance.  Moreover, all of the Machines will require support, parts or service in the future and Negri Bossi will not provide this."
Defendant's attempt to obtain possession of the machines is vital to this case.  Had Defendant simply accepted its loss and entirely walked away from the machines, its refusal to provide servicing capabilities could not be seen as an attempt to recover a pre-petition debt.  Plaintiff's counsel reluctantly admitted as much during oral argument.  By using the refusal of servicing capabilities as leverage to obtain possession of the machines, however, Defendant clearly sought to recover on its pre-petition claim.  That said, it does not matter that Defendant admitted to using the refusal of services as leverage; it is the combination of conduct, not Defendant's mere words, that resulted in a violation of the stay.

requiring Defendant to provide servicing capabilities to purchasers of the machines.[7]  "At

the permanent injunction stage, the requirements for injunctive relief are success on the

merits, irreparable harm, a balance of harms weighing in favor of the prevailing party, and

public interest weighing in favor of the injunction."  *McCuiston v. Hoffa*, 351 F. Supp. 2d

682, 689 n.5 (E.D. Mich. 2005); *see also Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th

Cir. 2006).  In addition to the arguments analyzed above regarding Plaintiff's success on

the merits, Defendant asserts that the bankruptcy court erroneously analyzed the

remaining factors for injunctive relief.

   As an initial matter, Defendant disputes that its refusal to provide servicing

capabilities gives rise to irreparable injury.  Defendant contends that any damages caused

by its refusal of servicing capabilities could be measured and remedied by a monetary

award equivalent to the cost of replacement servicing capabilities.  If the resolution were

so simple, however, Defendant's denial of servicing capabilities would not have been

coercive or violative of § 362(a)(6) in the first place.  As detailed in footnote 2, *supra*,

there remains a substantial likelihood that the machines will be inoperable without

Defendant's assistance and, in exploring alternative options, purchasers would face

increased costs in time and money.  Furthermore, because it is only speculative to assume

that another company could successfully provide servicing capabilities, this measure of

---

[7]The bankruptcy court drew on the provisions of 11 U.S.C. § 105(a) for its authority to grant injunctive relief.  That section states, "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  *Id.*  Another provision of the bankruptcy code creates a private right of action for violations of the automatic stay.  *See* 11 U.S.C. § 362(k).

damages is presently impossible to calculate.[8]

In contrast, the Court can quantify, to a certain extent, the impact of Defendant's conduct on bidding for the machines.  Without a guarantee of the availability of servicing capabilities, Plaintiff received only Defendant's bid for the machines of $100,000 plus waiver of Defendant's unsecured claim.  Meanwhile, with assurances of servicing capabilities, Draexlmaier paid $1,512,000 for two of the eight machines and Defendant purchased the remaining six machines for $499,730.  Setting aside the value of the waiver of Defendant's unsecured claim,[9] there is a $1.9 million difference between the proceeds from the machines with and without servicing capabilities.  The bankruptcy court concluded, and Defendant does not dispute, that Defendant would be rendered insolvent and uncollectable by any damage award at or above $1 million.  (*See* Bankr. Ct. Bench Op. at 57-58.)  Therefore, to the extent that Defendant would be rendered insolvent by a damage award,[10] the bankruptcy court correctly concluded that Defendant's conduct gives rise to irreparable injury.  *See Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d

---

[8]When the nature of the loss makes damages difficult to quantify, the damages are not fully compensable by a monetary award and, therefore, may be irreparable.  *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

[9]It is difficult to attach a precise monetary value to any waiver of Defendant's unsecured claim and neither party has attempted to do so on appeal.  Nonetheless it is safe to say that the value of the waiver is far less than the amount of the claim.  (*See* Bankr. Ct. Bench Op. at 53).  As a general rule, waiver of a bankruptcy claim would, on a dollar-for-dollar basis, increase the recovery of other creditors.  The waiver of Defendant's claim, however, comes at a cost of $1.9 million to the pot of money to be distributed.  The "value" of Defendant's waiver would arguably be the amount that Defendant recovers as a creditor to the larger pot of money.  That calculation, however, requires additional considerations regarding creditor priorities and administrative expenses that the Court is not prepared to discuss.

[10]Defendant makes no argument that the value of the waiver of its unsecured claim, as discussed in footnote 7, *supra*, would exceed $900,000.

18

380, 386 (7th Cir. 1984).

Next, Defendant contends that the bankruptcy court failed to consider the harm of entering an injunction.  Specifically, Defendant complains that the issuance of an injunction interferes with its right to freedom of contract.  *See, e.g.*, *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 129 S. Ct. 1109, 1118 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.").  While it is true that the injunction interferes with Defendant's freedom to choose the parties with which it will deal, that harm is mitigated to a certain extent by the fact that the injunction protects Defendant's ability to obtain a profit and allows Defendant to provide the servicing capabilities as it does to other customers in the ordinary course of business.  (*See* Bankr. Ct. Perm. Inj. Order ¶ 2.)  This mitigated harm to Defendant is outweighed by the irreparable harms, as discussed above, that would result if no injunction were entered.  In other words, Defendant's interest in the freedom of contract does not outweigh Plaintiff's interest in the enforcement of the bankruptcy code.

Finally, Defendant asserts that the public interest favors denial of injunctive relief. In making this argument, Defendant basically repeats the argument regarding the right to freedom of contract and alleges that the public has a derivative interest in ensuring that the freedom of contract is respected by the courts.  Assuming that such a public interest exists, the public has at least an equivalent interest in enforcement of the provisions of the bankruptcy code, especially insofar as those provisions seeks to ensure the fair treatment of bankruptcy creditors.  Therefore, the Court concludes that the public interest factor

19

also weighs in favor of the issuance of an injunction in this case.

Having independently reviewed the injunctive relief factors, the bankruptcy court's reasoning, and Defendant's objections thereto, the Court concludes that injunctive relief is an appropriate remedy in this case and affirms the bankruptcy court's order to that effect.

**V. Plaintiff's Remaining Claims and Defendant's Motion for Summary Judgment**

As previously discussed, the bankruptcy court's disposition of Plaintiff's remaining claims and Defendant's motion for summary judgment depended on the conclusion that Plaintiff is entitled to relief on her § 362(a)(6) claim. Specifically, the bankruptcy court declined to address Plaintiff's remaining claims because those claims sought the same relief that the court had already granted as to the § 362(a)(6) claim. Similarly, the bankruptcy court denied Defendant's motion for summary judgment based on the conclusion that Defendant violated § 362(a)(6) and did not address Defendant's potential liability on the remaining claims. Because this Court is affirming the bankruptcy court's opinion as to the § 362(a)(6) claim, this Court also declines to address the merits of the remaining claims and Defendant's motion for summary judgment. As indicated in this Court's prior opinion and order granting Defendant's motion for leave to appeal, this Court has no intention to address the merits of claims that were not addressed by the bankruptcy court in the first instance. (*See* September 30, 2009, Opinion and Order, Docket Entry No. 7, at 5.)

**VI. Conclusion**

Defendant's conduct in this case gave rise to a violation of 11 U.S.C. § 362(a)(6).

20

Because the damage resulting from that violation was otherwise irreparable, the

bankruptcy court appropriately granted Plaintiff's request for injunctive relief.

Accordingly,

**IT IS ORDERED** that the bankruptcy court's July 30, 2009, bench opinion and

subsequent entry of a permanent injunction against Defendant is **AFFIRMED**.

A judgment consistent with this opinion shall issue.

<u>s/PATRICK J. DUGGAN</u>
UNITED STATES DISTRICT JUDGE

Copies to:
Howard S. Sher, Esq.
Michele L. Walton, Esq.
Anissa C. Hudy, Esq.
John J. Bursch, Esq.
Hon. Thomas J. Tucker